IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


BRENDA BATTLE,

       Plaintiff,


    vs.                            Civil Action 2:09-CV-651
                                      Magistrate Judge King


OHIO DEPARTMENT OF REHABILITATION
AND CORRECTION,

       Defendant.


## OPINION AND ORDER

    This is an employment action under Title VII, 42 U.S.C. § 2000e-5, in which plaintiff, formerly a corrections officer, alleges that she was discriminated against on account of her race and gender and in retaliation for engaging in a protected activity.  With the consent of the parties, 28 U.S.C. § 636(c), this matter is before the Court *Motion for Summary Judgment of Defendant Ohio Department of Rehabilitation and Correction*, Doc. No. 21 ("*Motion for Summary Judgment*").  For the reasons that follow, the *Motion for Summary Judgment* is **GRANTED.**

I.    **BACKGROUND**

      A.    **Ohio Department of Rehabilitation and Correction Standards of Employee Conduct**

          1.    **General overview**

    The Ohio Department of Rehabilitation and Correction ("ODRC") has promulgated Standards of Employee Conduct applicable to all employees

("the Standards"). The standards aim

> to inform all employees of the Ohio Department of Rehabilitation and Correction of the Department's standardized rules of conduct. All Ohio Department of Rehabilitation and Correction employees are subject to these standards. Some of the Standards may have their basis in statutory or regulatory provisions, based upon the reality of working within a correctional setting.

*Exhibit C*, p. 1, attached to *Deposition of Brenda Battle,* Doc. No. 15 ("*Plaintiff Depo.*").

The Standards not only define performance standards, but also establish a range of discipline for violations of those standards. *See id.* Discipline, which ranges from oral reprimand to removal from employment, is intended to be progressive. *Id.* at 7-8. Moreover, the appointing authority is expected to consider the facts underlying the particular violation as well as "prior disciplinary history, length of time since the last discipline and mitigating and aggravating circumstances." *Id.* at 7. According to ODRC, it will not necessarily "administer the exact same level of disciplinary action specified in the Standards of Conduct the same way in each and every instance. . . . [because each violation] turns on its own facts[.]" *Id.*

## 2. Specific rules

Rule 24 of the Standards of Employee Conduct ("Rule 24") expressly prohibits "[i]nterfering with, failing to cooperate in, or lying in an official investigation or inquiry." Authorized discipline for a first violation of Rule 24 ranges from a two-day suspension and fine to removal; a second offense may be punished by a five-day suspension and fine or removal. *Id.* at 8, 13.

Rule 30(C) of the Standards of Employee Conduct ("Rule 30(C)")

2

forbids the "[u]nauthorized conveyance, distribution, misuse, or possession of contraband" "[w]hile on duty or on state owned or leased property[.]" *Id.* at 13-14.  Contraband

> is defined as 'any' article which is intended for the unauthorized use or possession of any inmate or which is prohibited by law or which Department policy prohibits from being carried onto the grounds of any institution, detention facility or office under the control of the Department of Rehabilitation and Correction. . . . Examples of contraband, which are prohibited by law (ORC Section 2921.036), include firearms, knives, explosives, ammunition, drugs alcoholic beverages, cellular telephones, two-way radios and other electronic devices.

*Id.* at 4.  Authorized discipline for a first violation of Rule 30(C) consists of a two-day suspension and fine to removal; a second offense may be punished by a five-day suspension and fine or removal.  *Id.* at 8, 14.

Rule 38 of the Standards of Employee Conduct ("Rule 38") prohibits "[a]ny act or commission not otherwise set forth herein which constitutes a threat to the security of the facility, staff, any individual under the supervision of the Department, or a member of the general public." *Id.* at 15.  Authorized discipline for a first violation of Rule 38 consists of a two-day suspension and fine to removal; a second offense may be punished by a five-day suspension and fine or removal.  *Id.* at 8, 15.

Rule 46(A) of the Standards of Employee Conduct ("Rule 46(A)") addresses "[u]nauthorized [r]elationships" and expressly forbids "[t]he exchange of personal letters, pictures, phone calls or information with any individual under the supervision of the Department or friends or family of same, without express authorization of the Department." *Id.* at 16.  Authorized discipline for a first

3

violation of Rule 46(A) consists of a two-day suspension and fine to removal; a second offense may be punished by a five-day suspension and fine or removal.  *Id.* at 8, 16.

### B.   **Plaintiff's Employment with the ODRC**

Plaintiff is an African-American woman who began work for the ODRC in 1994 as a corrections officer at the Corrections Reception Center ("CRC").  *Plaintiff Depo.*, pp. 11, 22.  Plaintiff worked at CRC as a corrections officer until her termination on July 31, 2007.  *Id.* at 22-23; *Plaintiff Depo. Exhibits O* and *P.*  CRC Warden Virginia Lamneck, a white female, was the warden at CRC at all relevant times and terminated plaintiff for violating Rules 24, 30(C), 38 and 46(A). *Id.*; *Deposition of Virginia Lamneck*, pp. 5-8, Doc. No. 19 ("*Lamneck Depo.")*.  That termination forms the subject of this litigation. *Complaint*, Doc. No. 1.

### C.   **Plaintiff's Duties as Corrections Officer**

As a corrections officer, plaintiff was responsible for maintaining security in assigned areas within CRC.  *Plaintiff Depo.*, pp. 31-33; *Plaintiff Depo. Exhibit B.*  Plaintiff was assigned to Housing Unit A4, which housed 168-178 inmates.  *Plaintiff Depo.*, p. 33.  Plaintiff ensured that all the doors were locked in this area and she counted inmates.  *Id.* at 31-33.  During the last two years of her employment, plaintiff worked the first shift, from 6:00 a.m. through 2:00 p.m.  *Id.* at 28.

### D.   **Plaintiff's Lost Cell Phone and Subsequent Investigation**

On February 14, 2007, plaintiff lost her cell phone.  *Id.* at 41-42.  She last saw her phone just before begining her 6:00 a.m. shift

on that day. *Id*. at 47-48. Plaintiff searched for her phone, but was unable to locate it. *Id*. at 42.

On February 15, 2007, at 5:45 a.m., plaintiff's cell phone was found inside CRC. *Plaintiff Depo. Exhibits J* and *K*. CRC Captain Fisher reported that he had found the phone. *Id*. Later that morning, CRC Institutional Investigator Jon Fausnaugh received the phone and was asked to investigate it. *Deposition of Jon C. Fausnaugh*, pp. 25-26, Doc. No. 20 ("*Fausnaugh Depo.*"). Mr. Fausnaugh inspected the phone to determine its owner, when it was last used and whether an inmate had used it. *Id*. at 27. He discovered seven saved photographs, some of which appeared to have been taken inside CRC. *Id*. at 27-28; *Plaintiff Depo. Exhibit K*, p. 1.

As a result of this inspection, Mr. Fausnaugh interviewed three CRC employees who appeared in these photos, including Officer William Underwood, Sergeant Michael Ackison and plaintiff. *Plaintiff Depo. Exhibit K*, pp. 1-2. During her interview, plaintiff advised Mr. Fausnaugh that the cell phone belonged to her and that she had lost it the day before, on February 14, 2007. *Id*. at 2; *Plaintiff Depo.*, p. 50.

Plaintiff also advised that she had inadvertently brought the phone into CRC the week before she lost the phone; four photographs were taken inside Sergeant Ackison's office. *Plaintiff Depo. Exhibit K*, p. 2; *Plaintiff Depo.*, p. 50; *Plaintiff Depo. Exhibits F*, *G* and *K*. According to plaintiff, she did not realize that the phone was in the chest pocket of her uniform until 11:00 a.m. or noon that day, when Sergeant Ackison observed it in her pocket. *Plaintiff Depo.*, pp. 53-55. Plaintiff did not report this incident and, to her knowledge, no

one notified CRC management about her conveyance of the phone inside CRC. *Id.* at 58-59.

After noticing that plaintiff's internal phone logs revealed calls made during duty hours, Mr. Fausnaugh received permission from the ODRC director to subpoena Verizon Wireless Telephone Company for plaintiff's phone records. *Fausnaugh Depo.*, pp. 31-33; *Plaintiff Depo. Exhibit K*, p. 3; *Fausnaugh Depo. Exhibit 21*. On March 26, 2007, Verizon responded to the subpoena. *Plaintiff Depo. Exhibit K*, p. 3. After reviewing the subpoenaed Verizon records, Mr. Fausnaugh identified 870 calls made during duty hours on 182 days between the period January 6, 2006 to February 14, 2007. *Plaintiff Depo. Exhibit K*, p. 3. In the course of reviewing these records, Mr. Fausnaugh identified several numbers that were also called by inmates. Mr. Fausnaugh ultimately prepared a report ("investigative report"). *Id.*

**E.    Telephone Call Related to Former Inmate David Crowe; Plaintiff Placed on Administrative Leave**

First, Mr. Fausnaugh noticed that plaintiff's cell phone twice called the home telephone number of David Crowe, a former CRC inmate housed in Unit A4,[1] and his wife, Lynn Crowe. *Id.* at 4. These calls were made on October 18, 2006, *i.e.*, the day that Mr. Crowe was transferred from CRC to Toledo Correctional Institution ("TCI"). *Id.* at 4-5. Mr. Fausnaugh noted that the first call had "*67" before the number, which is a code used to block the number making the call. *Id.* at 4.

On April 6, 2007, Mr. Fausnaugh interviewed Mr. Crowe. *Id.* Mr. Crowe stated that he had asked plaintiff if he could use the inmate

---

[1] Mr. Crowe was released from prison on December 15, 2006. *Id.* at 4.

telephone to call his wife and tell her not to visit him at CRC because of the impending transfer to TCI. *Id*. at 5. According to the investigative report, Mr. Crowe also stated that plaintiff had advised him that, although he could not call his wife, plaintiff would call her for him. *Id*. Mr. Crowe gave plaintiff his home telephone number. *Id*.

On April 6, 2007, Mr. Fausnaugh interviewed Lynn Crowe, who confirmed that she received a call from a female on the day of Mr. Crowe's transfer. *Id*. According to the investigative report, this person, who Ms. Crowe believed to be a CRC staff member, advised Ms. Crowe that Mr. Crowe was to be transferred and that she should not come to CRC to visit him. *Id*. Ms. Crowe further stated that she later spoke to her husband about the call when he telephoned her from Toledo. *Id*. She expressed gratitude for the call because it saved her from making a long drive to CRC on the day of her husband's transfer. *Id*.

Thereafter, Mr. Fausnaugh used the Inmate Telephone Monitoring System ("ITMS"), which records inmate telephone calls, to retrieve Mr. Crowe's telephone call to his wife on October 19, 2006. *Id*. In that recorded call, Mr. Fausnaugh heard Mr. Crowe ask his wife if "Ms. Battle called?" and she responded, "Yes." *Id*. Mrs. Crowe further stated, "No, she [the caller who advised Mrs. Crowe of Mr. Crowe's transfer] was like, I know I'm not supposed to do this, but Crowe wanted me to tell you he rode out this morning." *Id*. Mr. Crowe responded to this by saying, "She's excellent." *Id*. at 6. In the last 30 seconds of this recorded call, Mr. Crowe commented that plaintiff and another individual "were the coolest officers down at

7

CRC." *Id*.

Pending a continued investigation into plaintiff's cell phone records, Warden Lamneck placed plaintiff on administrative leave effective April 10, 2007. *Plaintiff Depo. Exhibit L; Lamneck Depo.*, pp. 25-26. Warden Lamneck took this action because she believed that the "security of the institution was compromised." *Lamneck Depo.*, p. 26.

### F.    Telephone Call Related to Inmate Quintin Howard

The subpoenaed Verizon records also revealed that plaintiff's cell phone had called a particular telephone number three times on May 18, 2006, prior to 7:00 a.m. *Plaintiff Depo. Exhibit E*, p. 27. The third call used the code "*67" before the number and lasted 127 seconds. *Id*. Upon review of inmate call records, Mr. Fausnaugh determined that Quintin Howard, an inmate housed in Unit A4 on May 17, 2006 through May 18, 2006, had also called this telephone number. *Plaintiff Depo. Exhibit K*, p. 4. Mr. Fausnaugh further determined that the number belonged to one of Mr. Howard's visitors, one Melissa Jones. *Id*. at 6.

On April 12, 2007, Mr. Fausnaugh and Bryan Wellinghoff, a CRC investigator, interviewed Ms. Jones. *Id*. According to Ms. Jones, she had planned to visit Mr. Howard at CRC on May 18, 2006. *Id*. However, as she was preparing to leave or had just left her home to visit him on that day, she received a telephone call from a female who she believed to be a CRC staff member. *Id*. The caller advised that Ms. Jones should not visit CRC because Mr. Howard was to be transferred that day. *Id*.

On April 13, 2007, Mr. Fausnaugh and Mr. Wellinghoff interviewed

8

Mr. Howard at Ross Correctional Institution ("RCI"). *Id*. During the interview, Mr. Howard said that he had no knowledge of any staff member contacting Ms. Jones on the day that he was transferred from CRC. *Id*.

After the interview, Mr. Howard called Ms. Jones and informed her that he had just been interviewed. *Id*. Ms. Jones responded that she, too, had recently been interviewed and repeated that a female staff member had called her on the day of his transfer. *Id*.

**G.    Plaintiff's Second Interview**

On May 16, 2007, Mr. Fausnaugh interviewed plaintiff a second time regarding the telephone calls reflected on her cell phone. *Id*. at 7. He shared the results of his investigation. *Id*. After he informed her that her cell phone reflected calls during duty hours on 182 days, plaintiff responded that she shared her cell phone with her son, who knew a lot of people. *Id*. After Mr. Fausnaugh shared his findings related to the calls and interviews with Messrs. Crowe and Howard, plaintiff stated that she did not remember these inmates and did not recall placing telephone calls to Ms. Crowe and Ms. Jones. *Id*.

**H.    Predisciplinary Conference**

Thereafter, plaintiff received notice of a predisciplinary conference and was advised that she was charged with violating Rules 24, 30(C), 38 and 46, as supported by the investigative report. *Plaintiff Depo.*, pp. 93-94; *Plaintiff Depo. Exhibit M.* On June 20, 2007, a predisciplinary conference was held. *Plaintiff Depo. Exhibit N.* Plaintiff, who attended with a union representative, had the

opportunity to speak at the conference. *Plaintiff Depo.*, p. 94; *Plaintiff Depo. Exhibit N*. The hearing officer found just cause for discipline based on the evidence presented, as detailed in her report. *Plaintiff Depo. Exhibit N*.

**I.   Termination of Employment and Grievance**

Warden Lamneck removed plaintiff from her position effective July 31, 2007. *Plaintiff Depo. Exhibits O* and *P*. At the time of her removal, the only other discipline that plaintiff had received was a three-day suspension in 2001 or 2002 and a written reprimand. *Plaintiff Depo.*, p. 27.

After her removal, plaintiff filed a grievance through her union, alleging that there was not just cause for the termination of her employment. *Plaintiff Depo.*, pp. 141-42; *Plaintiff Depo. Exhibit Q*. That grievance proceeded to arbitration on March 12, 2008. *Plaintiff Depo.*, pp. 142-45; *Plaintiff Depo. Exhibit R*. The arbitrator determined that plaintiff had not violated Rule 46(A), which addresses unauthorized relationships and forbids the exchange of, *inter alia*, phone calls. *Plaintiff Depo. Exhibit R*, pp. 30-34 (concluding, *inter alia*, that there was no "exchange" because plaintiff "imparted information but received nothing in return"). The arbitrator also determined that plaintiff had not violated Rule 24, which prohibits employees from interfering with, failing to cooperate in, or lying in an official investigation. *Id*. at 32-34 (finding that, *inter alia*, "the Agency's interpretation of Rule 24 impermissibly infringes on Grievant's right to develop her defenses and to assert her constitutional rights"). However, the arbitrator did find that

plaintiff had violated Rule 30(C), which forbids the unauthorized misuse or possession of contraband while on duty at CRC, and Rule 38, which prohibits any act that constitutes a threat to security. *Id*. at 25-28.

In determining the appropriate discipline, the arbitrator noted, *inter alia*, that plaintiff had been employed for 13 years with a record of satisfactory job performance and no active discipline at the time of her removal. *Id*. at 34. Nevertheless, on August 5, 2008, the arbitrator upheld Warden Lamneck's decision to terminate plaintiff's employment because of the severity of plaintiff's violations:

> This balance of mitigative and aggravative factors indicates that the Grievant [plaintiff] deserves a heavy dose of discipline. . . . In this case, the Grievant's misconduct profoundly implicates her trustworthiness and respect for the Agency's rules, and commitment to the Agency's mission. Correction officers are the primary, if not the only, line of defense against contraband and must remain wholly trustworthy. The Agency must fully trust its correction officers, remaining ever confident that, as members of its security team, correction officer[s] are part of the solution, rather than the reverse. Unfortunately, in this case, the Grievant manifestly was not part of the solution. Indeed, given the 870 phone calls and notification of Ms. Crowe and Ms. Jones, the Grievant has proved to be a recalcitrant, continual part of the problem. Finally, for the first violation of either Rule 30 or Rule 38, the Agency's penalty table calls for either a two-day fine, suspension, working suspension, *or* removal. In this particular case, just cause is not offended by removal for a first violation of Rules 30 and 38.

*Id*. at 34-35 (emphasis in original) (footnote omitted).

### J. Plaintiff Files Charge of Discrimination with the Ohio Civil Rights Commission

On December 20, 2007, plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC"), alleging that she had been terminated because of her race and gender. *Plaintiff Depo.*, pp. 146-47; *Plaintiff Depo. Exhibit S*.

**K.    Plaintiff's Visiting Privileges Denied**

As of October 17, 2007, plaintiff's son was incarcerated at Southeastern Correctional Institution ("SCI") in Lancaster, Ohio. *Plaintiff Depo.*, p. 172. On December 10, 2007, plaintiff completed an application to visit her son at SCI.  *Id.* at 173; *Plaintiff Depo. Exhibit W.*  The application explained the visiting procedures:

> If your application is accepted, your initial status will be <u>tentatively approved</u> pending verification of your identity at the time of your first visit.[] If accepted after this verification, your status will be changed to <u>approved</u>.  You may not send the offender packages until your status has been <u>approved</u>.  <u>It is the offender's responsibility to notify you of your status.</u>

*Id.* at 2 (emphasis in original).

After she submitted the application, plaintiff's son told her that her application had been approved and plaintiff visited him on February 10, 2008.  *Id.*; *Plaintiff Depo.*, pp. 173-74.

CRC Warden Lamneck learned that plaintiff was on the approved visitation list for plaintiff's son.  *Lamneck Depo.*, p. 69.  On February 20, 2008, Warden Lamneck sent an email to SCI Warden Mark Saunders, stating that "[f]ormer CO Brenda Battle is on the attached visitation list for her son.  Brenda was removed from her position at CRC.  Her case is scheduled for arbitration.  Thought you would like to know this." *Plaintiff Depo. Exhibit CC.*

After receiving this email, Warden Saunders notified, *inter alios*, Darrell Cunningham, SCI deputy warden, that plaintiff "was fired for inappropriate relationships with inmates.  She is not to visit here as her behaviors and influence are clearly negative." *Id.* Deputy Warden Cunningham confirmed that plaintiff was on the approved visitor list.  *Id*; *Plaintiff Depo. Exhibit X*; *Deposition of Darrell*

*Cunningham*, Doc. No. 16, pp. 24-27 ("*Cunningham Depo.*"). On February 27, 2008, he issued a restriction on her visitation rights. *Id.* On March 6, 2008, plaintiff appealed this restriction. *Plaintiff Depo. Exhibit Y.* However, Richard Chuvalas, SCI Warden Assistant, reviewed plaintiff's appeal and affirmed the decision of SCI Warden Saunders to restrict plaintiff's visitation rights. *Plaintiff Depo. Exhibit Z; Deposition of Richard Chuvalas*, Doc. No. 18, pp. 38-40 ("*Chuvalas Depo.*").

### L.   Plaintiff Files Charge of Retaliation with the Ohio Civil Rights Commission

On March 24, 2008, plaintiff filed a second charge with OCRC, alleging that her SCI visitation rights had been terminated in retaliation for filing her initial charge of race and gender discrimination. *Plaintiff Depo. Exhibit U.* On September 11, 2008, the OCRC issued its determination that "there is **PROBABLE CAUSE** to believe that the Respondent engaged in an unlawful discriminatory practice" when plaintiff's visitation privileges were terminated. *Exhibit 40*, attached to *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*, Doc. No. 22 (*"Memo. in Opp."*). ODRC requested reconsideration of this decision, which was denied. *Exhibits 41* and *42*, attached to *Memo. in Opp.*

### M.   The Instant Litigation

Plaintiff filed this action on July 24, 2009, alleging that she had been discriminated against on account of her race and gender and in retaliation for having engaged in protected activity. *Complaint.* Plaintiff thereafter filed the *First Amended Complaint*, Doc. No. 4. ODRC moved for summary judgment, which plaintiff opposed. With the

filing of *Reply Memorandum of Defendant Ohio Department of Rehabilitation and Correction in Support of Its Motion for Summary Judgment*, Doc. No. 24 ("*Reply*"), this matter is now ripe for adjudication.

## II.  STANDARD

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  Pursuant to Rule 56(c), summary judgment is appropriate if "there is no genuine issue as to any material fact ...."  *Id.*  In making this determination, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).  However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the

14

opposing party. *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Catrett,* 477 U.S. at 323. Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995)("nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial"). "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations. It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'" *Glover v. Speedway Super Am. LLC,* 284 F.Supp.2d 858, 862 (S.D. Ohio 2003)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Instead, the non-moving party "must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover,* 284 F.Supp. 2d at 862 (citing *InteRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989)). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists

15

on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id.*

## III. DISPARATE TREATMENT UNDER TITLE VII

### A. Standard

Plaintiff alleges that she was terminated because of her race (African-American) and her gender. *First Am. Compl.*, ¶¶ 29-42. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, . . . or by showing the existence of circumstantial evidence which creates an inference of discrimination[.]" *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citations omitted).

Plaintiff does not allege direct evidence of discrimination, but instead relies on circumstantial evidence. *Plaintiff Depo.*, pp. 140-41; *Memo. in Opp.*, pp. 6-11. Where a plaintiff relies on circumstantial evidence, a court analyzes the claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981).

Under the *McDonnell Douglas* framework, a plaintiff must first

16

establish a *prima facie* case of discrimination by demonstrating that:
(1) she was a member of a protected class; (2) she was subject to an
adverse employment action; (3) she was qualified for the job; and (4)
for the same or similar conduct, she was treated differently from
similarly situated non-protected employees. *McDonnell Douglas*, 411
U.S. at 802; *Burdine*, 450 U.S. at 252-56; *Perry v. McGinnis*, 209 F.3d
597, 601 (6th Cir. 2000).

Once the plaintiff has met this initial burden, the burden of
production shifts to the employer "to articulate some legitimate,
nondiscriminatory reason for the" adverse employment action.
*McDonnell Douglas*, 411 U.S. at 802. If the defendant employer
satisfies its burden, the plaintiff must then show not only that
defendant's articulated reason was a pretext, but that the real reason
was unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.
502, 511 (1993). The ultimate burden of persuasion remains throughout
this burden-shifting analysis on the plaintiff. *See Burdine*, 450 U.S.
at 253.

**B.  *Prima Facie* Case: Similarly Situated Employees**

ODRC does not dispute that plaintiff meets the first three
elements of her *prima facie* case. *Motion for Summary Judgment*, p. 9.
Plaintiff is an African-American female; she was qualified for her
position; and she was subjected to an adverse employment action.
However, ODRC contends that plaintiff cannot meet the fourth element
of her *prima facie* case, which requires evidence that ODRC treated
plaintiff differently than other similarly situated employees. *Motion
for Summary Judgment*, pp. 9-13.

"It is the plaintiff's burden to establish that a similarly

17

situated person outside the protected class was treated more favorably than [she]." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728-29 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  That is, plaintiff must show that she and the comparable employee are "nearly identical" in "all *relevant* aspects" of their employment situations.  *Id.* (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted) (emphasis in original)).  More specifically, to be "similarly situated" in the disciplinary context, the plaintiff and her proposed comparator must have engaged in acts of "'*comparable seriousness*.'"  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (emphasis in original)).  In making this determination, the Court considers whether the individuals "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell*, 964 F.2d at 583) (internal quotation marks omitted)).  However, the Court need not consider such factors when they are not relevant.  *Wright*, 455 F.3d at 710.  "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated."  *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004).  In sum, a court makes "an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee" in order to

determine whether two individuals are similarly situated with regard to discipline.  *Wright*, 455 F.3d at 710 (quoting *Mitchell*, 964 F.2d at 583) (internal quotation marks omitted)).

Plaintiff alleges that she was treated more harshly than two[2] similarly situated employees.  *First Am. Compl.*, ¶¶ 34, 41; *Memo. in Opp.*, pp. 8-11.  The Court will address each employee in turn.

### 1.    Bryan Wellinghoff

Plaintiff alleges that Bryan Wellinghoff, a Caucasian male serving as a CRC assistant investigator who lost his personal cell phone inside CRC, but who was not reprimanded, is a valid comparator who was treated more favorably than she.  *Plaintiff Depo.*, pp. 87, 148-49, and *Plaintiff Depo. Exhibit A*, p. 10.  ODRC contends that Mr. Wellinghoff is not similarly situated because (1) he held a different position than plaintiff, who was a corrections officer; (2) Mr. Wellinghoff's offense was "not of comparable seriousness" because he had permission from CRC Warden Lamneck to bring his personal cell phone into CRC; and (3) he reported that his cell phone was lost on CRC grounds.  *Plaintiff Depo.*, pp. 151; *Plaintiff Depo. Exhibit A*, p. 10; *Motion for Summary Judgment*, p. 10; *Reply*, pp. 3.

Plaintiff argues that job duties alone do not determine whether individuals are similarly situated.  *Memo. in Opp.*, p. 10.  She further argues that other relevant factors include the facts that (1) CRC Warden Lamneck was the same decision-maker for plaintiff and Mr. Wellinghoff; (2) plaintiff and Mr. Wellinghoff were subject to the

---

[2]Plaintiff at one point identified seven purportedly similarly situated employees.  *Plaintiff Depo. Exhibit A*, pp. 10-12.  However, the *Memo. in Opp.* addresses only two employees, who will therefore be the focus of this Court's analysis.

same standards; (3) the offense was of comparable seriousness because he did not have permission from Warden Lamneck to have his cell phone in CRC; and (4) Warden Lamneck's decision to discipline plaintiff but not Mr. Wellinghoff was a subjective decision that does not preclude a finding that the offenses were of comparable seriousness. *Id.* at 10-11.

The Court concludes that Mr. Wellinghoff is not similarly situated to plaintiff for the following reasons. First, there is evidence that Mr. Wellinghoff had permission from CMC Warden Lamneck to carry his personal cell phone at the time that he lost his phone inside the facility. *Plaintiff Depo.*, p. 87; *Plaintiff Depo. Exhibit T*.[3] Conversely, plaintiff, who previously received the Standards of Employee Conduct, *Plaintiff Depo. Exhibit D*, admitted that she knew that cellular telephones were considered contraband and that there is no evidence that she had permission to bring her phone inside CMC. *Id.*; *Plaintiff Depo.*, pp. 35-36.

Second, plaintiff and Mr. Wellinghoff engaged in different conduct – a distinction that is relevant to this case. Unlike plaintiff, Mr. Wellinghoff was not charged with placing numerous calls during duty hours and notifying inmate families and girlfriends of imminent inmate transfers. *Plaintiff Depo.*, pp. 93-94, 149; *Plaintiff*

---

[3]Although plaintiff conceded in her deposition that Mr. Wellinghoff had permission to carry his cell phone into CMC, *Plaintiff Depo.*, p. 87, plaintiff now argues that he lacked the requisite authorization because permission was not given to him until CMC Warden Lamneck's memo, dated March 13, 2008, *i.e.*, after Mr. Wellinghoff had lost his phone inside the facility. *Plaintiff Depo. Exhibit T*; *Exhibit 45*, Doc. No. 23-1. Defendants argue, however, that Warden Lamneck's memo was a revision of a prior memo issued on January 25, 2008, which therefore provided Mr. Wellinghoff with sufficient authorization at the time he lost his cell phone. *Id.*

*Depo. Exhibit M*.  Sharing sensitive information about inmate transfers with unauthorized inmate family and friends is a serious violation that compromises prison security and endangers prison employees. *Lamneck Depo.*, pp. 26, 29, 36; *Lamneck Depo. Exhibit 20*; *Plaintiff Depo. Exhibit R*, pp. 34-35.  Indeed, plaintiff herself concedes that calling families of inmates and advising of impending transfers threatens security, increases risk of inmate escapes and endangers prison officers.  *Plaintiff Depo.*, pp. 127-28.  Plaintiff has not offered any evidence that another employee was not discharged for committing a similar offense.  Under these circumstances, the Court will not second-guess Warden Lamneck's decision to charge plaintiff with violating certain rules and treating plaintiff more harshly than Mr. Wellinghoff.  *See*, *e.g.*, *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (citing, *inter alia*, *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999) (stating that courts should not act as a "super personnel department")); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management.").  Therefore, plaintiff's subjective belief that her violation and that of Mr. Wellinghoff, if any,  were of "comparable seriousness" fails to establish Mr. Wellinhoff as a valid comparator.  *See*, *e.g.*, *Foreman v. Farmer Jack Grocery Stores*, No. 96-1280, 1997 U.S. App. LEXIS 5675, at *4 (6th Cir. Mar. 21, 1997) (finding that a subjective, unverified personal belief was insufficient to establish a *prima facie* case); *Motoi v. Bristol Group, Inc.*, No. 05-362, 2007 U.S. Dist. LEXIS 12540, at *12 (E.D. Ky. Feb. 21, 2007) (concluding that alleged comparator

was not similarly situated where "plaintiff has presented only his subjective belief that the alcoholic former employee's conduct was as egregious as his own").

Third, Mr. Wellinghoff is employed as an assistant investigator, while plaintiff was employed as a corrections officer. *Plaintiff Depo.*, pp. 11, 22, 151. Plaintiff agrees that a corrections officer is charged with duties different from those of an investigator. *Id*. at 151. Indeed, as discussed *supra*, corrections officers are charged with, *inter alia*, maintaining security in designated areas within prison facilities. *Plaintiff Depo.*, pp. 31-33; *Plaintiff Depo. Exhibit B*. This difference in job titles and responsibilities is significant. *See*, *e.g.*, *Walker v. Ohio Dep't of Rehab. & Corr.*, No. 06-3900, 241 Fed. Appx. 261, 267 (6th Cir. July 11, 2007) ("The district court concluded that [proposed comparator] Darling was not similarly situated because he answered to a supervisor other than Warden Thomas and was himself a supervisory officer, not a front line correction officer [like plaintiff]. These distinctions are indisputably relevant."); *Triplett v. Shelby County Gov't*, 621 F. Supp. 2d 576, 583 (W.D. Tenn. 2008) ("In fact, there are many differences between Plaintiff's and [proposed comparator] Mr. Waites's employment. For example, Plaintiff was employed as a corrections officer, while Mr. Waites was an area manager."). *Cf. Davie v. Wingard*, 958 F. Supp. 1244, 1249 (S.D. Ohio 1997) ("This Court recently held that in a prison setting, safety and security are penological concerns of the 'highest order.'") (citations omitted) (aff'd and adopted *Davie v. Wingard*, 958 F. Supp. 1244 (S.D. Ohio Mar. 6, 1997)). Accordingly, the Court concludes that Bryan Wellinghoff is

not similarly situated to plaintiff.

### 2. Barbara Monroe

Plaintiff also alleges that Barbara Monroe, a Caucasian corrections officer who used a personal cell phone within CMC on September 13, 2008, is similarly situated. *Memo. in Opp.*, pp. 8-10; *Plaintiff Depo.*, pp. 157-58; *Plaintiff Depo. Exhibit A*, p. 10; *Lamneck Depo. Exhibits 27* and *28*. After two incident reports documented that Ms. Monroe was in possession of her personal cell phone while on duty on September 13, 2008, CMC Warden Lamneck ordered an investigation. *Lamneck Depo.*, pp. 72-73; *Lamneck Depo. Exhibit 27*, *28* and *29*. After the investigation, Ms. Monroe received notice that she was charged with violating Rule 7 of the Standards of Employee Conduct ("Rule 7")[4] and she received a written reprimand. *Lamneck Depo. Exhibit 29*.

Plaintiff contends that Ms. Monroe had a prior disciplinary record, engaged in the same conduct as did plaintiff, but was not disciplined as severely as was plaintiff. *Memo. in Opp.*, pp. 8-9. More specifically, Plaintiff complains that there is no evidence that Ms. Monroe's cell phone call log was checked or that her phone records were subpoenaed. *Memo. in Opp.*, pp. 9-10. Plaintiff further contends that she and Ms. Monroe should have been charged with violating the same rules and should have received the same discipline. *Id*. In response, ODRC argues that Ms. Monroe is not similarly situated to

---

[4]Rule 7 addresses an employee's "[f]ailure to follow post orders, administrative regulations, policies or directives." *Plaintiff Depo. Exhibit C*, p. 11. Authorized discipline for a first violation of Rule 7 ranges from a written reprimand, a one-day fine to a suspension; a second offense may be punished by a two-day fine to a suspension; authorized discipline for a third offense ranges from a five-day fine to a suspension; authorized discipline for a fourth violation is removal. *Id*.

plaintiff because (1) they engaged in different conduct, and (2) they did not in fact violate the same rules. *Motion for Summary Judgment*, p. 11; *Reply*, pp. 4-5.

ODRC's arguments are well-taken. First, as with Mr. Wellinghoff, plaintiff and Ms. Monroe engaged in different conduct and that difference in the alleged violations is relevant. Although the incident reports suggested that Ms. Monroe was using her cell phone to make a phone call, the investigation confirmed that Ms. Monroe was "in possession" of her personal cell phone, not that she actually used her phone to make a call during duty hours while in the facility. *Lamneck Depo. Exhibits 27, 28* and *29*. Conversely, the investigation involving plaintiff's cell phone revealed hundreds of calls made during duty hours and notification of inmate transfers, which created a security risk. *Lamneck Depo.*, p. 26; *Plaintiff Depo.*, pp. 127-28. Plaintiff complains that Ms. Monroe's phone log and records were not examined. However, such scrutiny was unwarranted because Ms. Monroe's cell phone was not lost and later recovered. After plaintiff lost her cell phone and it was given to Mr. Fausnaugh, he examined the phone log and stored photographs in order to identify the phone's owner. *Fausnaugh Depo.*, pp. 27, 31. Review of that log revealed calls made during duty hours and the date of the photos prompted Mr. Fausnaugh to seek a subpoena to gather plaintiff's phone records. *Id.* at 31-33. The circumstances surrounding the discovery of plaintiff's lost phone therefore led to the search of her phone log and records, which later revealed evidence of plaintiff's infractions. Therefore, the Court cannot say that plaintiff and her proposed comparator engaged in substantially similar behavior.

24

Second, plaintiff was charged with violating Rules 24, 30(C), 38 and 46, *Plaintiff Depo.*, pp. 93-94; *Plaintiff Depo. Exhibit M*, while Ms. Monroe was charged with violating Rule 7. *Lamneck Depo. Exhibit 29*. Although plaintiff complains that this difference results from Warden Lamneck's "completely subjective determination" and demonstrates discrimination, *Memo. in Opp.*, pp. 9-10, this Court disagrees. As discussed *supra*, plaintiff and Ms. Monroe engaged in completely different behavior and there is evidence that plaintiff, unlike Ms. Monroe, shared sensitive information regarding inmate transfers. In addition, plaintiff cannot rely on an unverified opinion as to Warden Lamneck's subjective belief to establish her *prima facie* case. *See Foreman v. Farmer Jack Grocery Stores*, No. 96-1280, 1997 U.S. App. LEXIS 5675, at *4 (6th Cir. Mar. 21, 1997). Moreover, as with the arguments raised relating to Mr. Wellinghoff, this Court cannot engage in management and disciplinary decisions best left to the employer. *See Smith*, 220 F.3d at 763; *Hedrick*, 355 F.3d at 462. Therefore, the fact that plaintiff and Ms. Monroe were charged with and disciplined for violating different rules precludes a finding that they are similarly situated. *See, e.g., Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001) (finding that plaintiff and proposed comparators who violated different rules were not similarly situated).

Finally, plaintiff complains that Warden Lamneck failed to adhere to the Standards of Employee Conduct in disciplining Ms. Monroe, who had a prior discipline history; specifically, plaintiff asserts that Ms. Monroe should have received a fine or suspension for a second violation of Rule 7 rather than the written reprimand. *Memo. in Opp.*,

pp. 8-9.  However, the fact that Ms. Monroe may have been punished less severely is irrelevant because, as discussed *supra*, she is not similarly situated.  Mr. Fausnaugh's investigative report provided evidence that plaintiff had notified inmate families of impending inmate transfers, which she acknowledged created a security risk. *Plaintiff Depo.*, pp. 127-28.  As a result of the findings in the investigative report, plaintiff was charged with violating Rules 24, 30(C), 38 and 46, all of which authorize removal for a first offense. *Plaintiff Depo. Exhibit C*, pp. 13-16.  The Standards of Employee Conduct specifically authorize a decision-maker such as Warden Lamneck to take aggravating and mitigating factors into consideration when determining appropriate discipline.  *Id* at 7.  Accordingly, the investigative report revealed circumstances that further distinguish the decision by Warden Lamneck to punish plaintiff more severely than Ms. Monroe.  Plaintiff and Ms. Monroe are therefore not "similarly situated."  *See*, *e.g.*, *Ercegovich*, 154 F.3d at 352 (stating, *inter alia*, that a proposed comparator must  "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

Because plaintiff cannot show that a similarly situated employee was treated more favorably than she, the Court concludes that plaintiff has failed to establish a *prima facie* case of race or sex discrimination.  *See*, *e.g.*, *McDonnell Douglas*, 411 U.S. at 802 (1973); *Burdine*, 450 U.S. at 252-56.  Accordingly, plaintiff's disparate treatment claim must fail.  *See*, *e.g.*, *Mitchell*, 964 F.2d at 582-84; *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 459 (6th Cir. 2004)

("[T]he district court correctly held that because [plaintiff] failed to establish a *prima facie* case of discrimination, [defendant] was entitled to summary judgment on the Title VII and R.C. § 4112.02 claims."); *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 233 (6th Cir. 1983)("Failure to establish a *prima facie* case by a preponderance of the evidence mandates dismissal of the claim.").

Therefore, as to plaintiff's claims of discrimination, ODRC's *Motion for Summary Judgment* is meritorious.

## IV. RETALIATION

Plaintiff also argues that ODRC's termination of her right to visit her son who was incarcerated at SCI constituted retaliation for her having filed a charge of discrimination on December 20, 2007. *Am. Compl.*, ¶¶ 43-48; *Memo. in Opp.*, pp. 13-19. Retaliation claims under Title VII are analyzed, with appropriate modifications, under the burden-shifting framework set forth in *McDonnell Douglas*. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). Under the *McDonnell Douglas* paradigm, a plaintiff claiming unlawful retaliation must first establish a *prima facie* case by demonstrating that (1) he engaged in a protected activity; (2) his actions were known to his employer; (3) his employer thereafter took an action that a reasonable employee would have found to be materially adverse; and (4) a causal link exists between his protected activity and the adverse action. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 66 - 70 (2006). *See also McDonnell Douglas*, 411 U.S. at 802; *Burdine,* 450 U.S. at 256.

Once a plaintiff establishes a *prima facie* case of retaliation, the burden of going forward then shifts to the defendant employer to

articulate a legitimate, nonretaliatory reason for its action. *Board of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24 (1978); *Wrenn*, 808 F.2d at 500.

If the defendant employer satisfies its burden of producing a legitimate, nonretaliatory reason for terminating the plaintiff's employment, the plaintiff must then prove by a preponderance of the evidence that the defendant intentionally retaliated against her. *Id*. The ultimate burden of persuasion remains throughout this burden-shifting analysis on the plaintiff. *Burdine*, 450 U.S. at 253; *Wrenn*, 808 F.2d at 501.

In the case *sub judice*, ODRC contends that plaintiff's retaliation claim fails because (1) she cannot establish a *prima facie* case, (2) ODRC has offered a legitimate, nonretaliatory reason for discharging plaintiff, and (3) plaintiff cannot establish that ODRC's proffered reason is pretextual.

### A.   *Prima Facie* Case

ODRC argues that plaintiff cannot establish a *prima facie* case because she cannot establish the second and fourth prongs, *i.e.*, knowledge on the part of the employer and a causal connection between her protected activity and removal. *Motion for Summary Judgment*, pp. 17-19; *Reply*, pp. 7-10.

### 1.   Knowledge on the part of employer

Plaintiff bases her retaliation claim on the termination of her rights to visit her son who was incarcerated at SCI in retaliation for engaging in protected activity, namely, the filing of a charge of discrimination on December 20, 2007.  In arguing that plaintiff cannot

28

meet the second prong of her *prima facie* case, ODRC focuses on the knowledge of SCI Warden Saunders who ordered the termination of plaintiff's visitation rights. *Motion for Summary Judgment*, pp. 17-19; *Reply*, pp.  Plaintiff, however, contends that the inquiry should focus on the knowledge of CRC Warden Lamneck whose email advising Warden Saunders of plaintiff's removal from CRC apparently resulted in the termination of plaintiff's rights. *Memo. in Opp.*, pp. 15-16.

In order to satisfy this prong of her *prima facie* case, plaintiff must "produce evidence sufficient to establish that the individuals charged with taking the adverse employment action knew of the protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002).  In making this determination, Warden Lamneck's knowledge and motive are relevant if she was "meaningfully involved" in or influenced Warden Saunders's decision to terminate plaintiff's visitation rights. *See Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) ("[C]ourts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee."); *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008) ("When an adverse . . . decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.")).

Here, the evidence establishes that SCI Warden Saunders had no knowledge that plaintiff had filed a charge of discrimination prior to restricting plaintiff's visitation rights. *Deposition of Mark Saunders*, Doc. No. 17, p. 62 ("*Saunders Depo.*").  However, the

evidence also establishes that a letter dated January 16, 2008, from the Central Office Bureau of Employee Relations addressed to CRC Warden Lamneck notified Warden Lamneck of plaintiff's charge. *Lamneck Depo.*, p. 67; *Lamneck Depo. Exhibit 24*. Warden Lamneck learned of plaintiff's charge within weeks of the date of this letter and no later than February 15, 2008. *Id.*; *Exhibit 46*, Doc. No. 23-2. It is undisputed that, on February 20, 2008, CRC Warden Lamneck informed SCI Warden Saunders that plaintiff had been removed from her position at CRC and that Warden Saunders used this information in deciding to terminate plaintiff's visitation rights. *Plaintiff Depo. Exhibit CC*; *Saunders Depo.*, pp. 39-42, 46-48, 55-59. Construing this evidence in a light most favorable to plaintiff, a reasonable jury could conclude that CRC Warden Lamneck – who was aware of plaintiff's protected activity – was "meaningfully involved" in and influenced the decision to terminate plaintiff's visitation rights. Accordingly, plaintiff has satisfied the second element of her *prima facie* case by showing that CRC Warden Lamneck knew of plaintiff's protected activity at the time of her email to SCI Warden Saunders, regardless of whether Warden Saunders knew of the protected activity at the time of the termination visitation rights. *Longs*, 647 F. Supp. 2d at 934.

> **2. Causal connection**

ODRC also argues that plaintiff cannot establish her *prima facie* case because she cannot show a causal connection between her charge of discrimination and the denial of her visitation rights. *Motion for Summary Judgment*, p. 18; *Reply*, p. 10. Plaintiff responds that the temporal proximity between her charge of discrimination and the termination of her visitation rights is sufficient to satisfy this

element.  *Memo. in Opp.*, pp. 16-17.

To prove a causal connection, plaintiff must produce sufficient evidence from which an inference can be drawn that SCI Warden Saunders terminated plaintiff's visitation rights because plaintiff filed the charge of discrimination.  *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (citations omitted).  Relevant factors to consider when determining causation include evidence that the employer treated the plaintiff differently than similarly situated employees, or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.  *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987); *Wrenn v. Gould*, 808 F.2d 493, 501 (6th Cir. 1987).  Although the United States Court of Appeals for the Sixth Circuit previously stated that "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim," *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007), more recent case authority suggests that temporal proximity may be sufficient to establish the necessary causal connection, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523-25 (6th Cir. 2008) (analyzing cases and concluding that prior Sixth Circuit "language does not preclude plaintiffs from ever using a temporal proximity closer than four months to establish an inference of retaliation").  *See also Lindsay v. Yates*, 578 F.3d 407, 419 (6th Cir. 2009) (finding that "the very close temporal proximity. . . creates an inference of unlawful discrimination for the purposes of summary judgment").

As discussed *supra*, CRC Warden Lamneck learned of plaintiff's charge of discrimination sometime between January 16, 2008 and

February 15, 2008.  On February 20, 2008, SCI Warden Saunders
terminated plaintiff's visitation rights.  Accordingly, based on
recent case authority, this Court concludes that this temporal
proximity is sufficient to establish the requisite causal connection
and, therefore, plaintiff's *prima facie* case.  *See id.*; *Mickey v*, 516
F.3d at 523-25.

### B.    Legitimate Nonretaliatory Reason

Having established a *prima facie* case, the burden now shifts to
ODRC to proffer a legitimate nonretaliatory reason for terminating
plaintiff's visitation rights.  *McDonnell Douglas*, 411 U.S. at 802;
*Burdine*, 450 U.S. at 253; *Wrenn*, 808 F.2d 493, 501 (6th Cir. 1987).
"Once defendant articulates the non[retaliatory] reasons, the *Burdine*
presumption of discrimination flowing from the prima facie case
automatically drops out of the case."  *Wrenn*, 808 F.2d at 501 (citing
*Weems v. Ball Metal & Chemical Div., Inc.*, 753 F.2d 527, 529 n.2 (6th
Cir. 1985)).

Here, ODRC has met its burden by articulating a legitimate reason
for terminating plaintiff's visitation rights, namely, security
concerns.  *Motion for Summary Judgment*, pp. 20-21.

### C.    Pretext

Because ODRC has met its burden of articulating a legitimate
reason, the burden now shifts back to plaintiff to show that this
articulated reason is mere pretext for retaliation.  *See Burdine*, 450
U.S. at 253.  A plaintiff may establish that an employer's stated
reason for its action was pretextual by showing that the reason (1)
had no basis in fact, (2) did not actually motivate the challenged

32

conduct, or (3) is insufficient to explain the challenged conduct. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). If the employer had an honest belief in the proffered basis for the adverse action, and if that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the plaintiff cannot establish that the basis for the adverse employment decision was pretextual. *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998). Thus, if "there is no material dispute that the employer made a 'reasonably informed and considered decision' that demonstrates an 'honest belief' in the proffered reason for the adverse employment action, the [retaliation claim] should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

Here, ODRC asserts that Warden Saunders honestly believed that the reasons for plaintiff's removal justified termination of her visitation privileges. *Reply*, p. 11. Plaintiff, however, contends that the proffered reason is pretextual because of (1) the "suspicious timing of the events," and (2) Warden Lamneck's ascertaining who was on plaintiff's son's visitation list. *Memo. in Opp.*, pp. 17-19.

Plaintiff's arguments are not well-taken. Plaintiff has the burden of establishing that ODRC did not "honestly believe" in the proffered reason for its adverse employment action. *Braithwaite*, 258 F.3d at 494. Whether or not ODRC has an "honest belief" is determined by its "reasonable reliance" on the particularized facts that were before it at the time the decision was made. *Id*. In evaluating whether there was "reasonable reliance" on the particularized facts,

courts "do not require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Smith*, 155 F.3d at 807.

     In this case, institutional wardens supervise decisions related to inmate visits. *Saunders Depo.*, pp. 10-11; *Saunders Depo. Exhibit 2*.  ODRC inmate visitation policies, which were effective during Warden Saunders's tenure at SCI, provide, *inter alia*, that applications for visitation, including those made by family members, may be denied if, *inter alia*, "[t]he applicant will not have a positive effect on the inmate's attitude, behavior, or overall adjustment." *Saunders Depo.*, pp. 26-27; *Saunders Depo. Exhibit 3*. *See also Plaintiff Depo. Exhibit AA*, pp. 5-6 (stating that visitation applications may be denied if "[t]he visitor's presence in the institution could reasonably pose a threat to the institution's security, or disrupt the orderly operations of the institution" or "[t]he visitor has a past record of disruptive conduct" or "[t]he visitor will not have a positive effect on the offender's attitude, behavior, or overall adjustment; or reentry efforts")), 8 ("Visitors may be excluded when there is reason to believe that their presence would be disruptive to the institution or the offender's adjustment.").  Wardens at the various institutions have broad discretion in regulating inmate visits because each institution is unique. *Saunders Depo. Exhibit 3*, p. 2.  Accordingly, wardens may establish guidelines affecting visitation that "vary to accommodate interests of institutional security and orderly operations." *Id.*

Here, Warden Lamneck, Warden Saunders and SCI Deputy Warden Darrell Cunningham all testified that it is a customary professional courtesy for a warden at one correctional institution to share information regarding former employees and visitors with a warden at different institution. *Lamneck Depo.*, pp. 62-63; *Saunders Depo.*, pp. 36-37, 41-43; *Cunningham Depo.*, p. 25.  When Warden Saunders receives such emails, including the email from Warden Lamneck regarding plaintiff's removal, he attempts to obtain as much information as possible about the situation. *Saunders Depo.*, pp. 40-43, 46-48.  In plaintiff's case, Warden Saunders learned that plaintiff "had brought in a cell phone, it had been used for inmate calls, calling inmate families, inappropriate relationship stuff[.]" *Id.* at 47.

Believing that plaintiff would not be a positive influence on her incarcerated son and would pose a security threat, Warden Saunders instructed that plaintiff's visitation privileges be terminated on this basis and reaffirmed such restrictions upon plaintiff's appeal of his decision. *Saunders Depo.*, pp. 47-; *Saunders Depo. Exhibi 8*; *Plaintiff Depo. Exhibits CC*, *X*, *Y* and *Z*.  When asked during his deposition why he believed that plaintiff posed a security threat, Warden Saunders explained:

> Simply for the fact that she [plaintiff] was trained, advised, signed off on, accepted the rules of the Ohio Department of Rehabilitation and Corrections in her employment contract and chose to violate them knowing those rules, the next logical step for someone who is trying to protect their environment is what will she do next, what rule is sacred to her that she would not violate.  So that was the security issue.

> She was very aware– we hold employees to a higher standard.  They know the rules.  They are trained.  Unlike if you would just come in and visit, we'd brief you.  We would assume that you have read the rules, and we try to

35

work with you in that regard.  Employees are much different.

They go to four or five weeks training over rules, over how to act and respond to situations in prisons, and how to administer and enforce rules.

When the person responsible for administering and enforcing the rules in the facility, which that is the trust we place in them, and the trust, frankly, the public places in them[,] intentionally violate those rules, you're wondering, okay, where is the line.  And that's why security would be an issue in her particular case.

*Saunders Depo.*, pp. 55-56.

Warden Saunders further explained why plaintiff would not be a positive influence on her incarcerated son:

We had a young man who we were trying to shape, trying to rehabilitate, trying to get back into society and be successful.  To have a person come in and visit with this person and have the influence on this person that a person who basically said, I know the rules, I don't care about the rules.

We're worried that the influence that the person might get is, rules aren't important, you can do what you want. And that's not the influence we want to put on that young guy.

We have some responsibility when he leaves this facility to say we did something positive in his life.  And I wouldn't be honest with myself or the [sic] with the public if I were to allow someone who got removed for a blatant violation of the rules that she was sworn to uphold and administer and let her come in and have that kind of influence on her son or that potential influence on her son.

*Id*. at 57-58.

Based on this evidence, the Court concludes that ODRC, through Warden Saunders, had an honest belief that security concerns justified the termination of plaintiff's visitation rights.  *Braithwaite*, 258 F.3d at 494; *Smith*, 155 F.3d at 807.  Therefore, as to plaintiff's retaliation claim, ODRC's *Motion for Summary Judgment* is likewise meritorious.

**WHEREUPON**, the *Motion for Summary Judgment of Defendant Ohio Department of Rehabilitation and Correction*, Doc. No. 21, is **GRANTED** in its entirety.

The Clerk shall enter **FINAL JUDGMENT** in this case.


August 20, 2010                          *s/Norah McCann King*

                                         Norah M<sup>c</sup>Cann King
                                  United States Magistrate Judge

37